**HO WAH GENTING KINTRON SDN BHD, d/b/a and f/k/a Kintron SDN BHD, Appellant,**

v.

**LEVITON MANUFACTURING CO., INC., Appellee.**

No. 04–03–00878–CV.

Court of Appeals of Texas, San Antonio.

Feb. 23, 2005.

Rehearing Overruled April 4, 2005.

**124**

Kevin F. Risley, Thompson, Coe, Cousins & Irons, L.L.P., Robert D. Arredondo, Manning, Gosda & Arredondo, L.L.P., Houston, for appellant.

Ruth B. Downes, Byron C. Keeling, Holman & Keeling, P.C., Houston, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's denial of appellant's special appearance. The underlying lawsuit was brought by several plaintiffs for injuries suffered in a mobile home fire allegedly caused by a defective extension cord. Plaintiffs alleged appellant and/or appellee negligently manufactured and marketed the cord. After appellee filed a cross-claim for indemnification against appellant, appellant filed a special appearance. The trial court denied the special appearance and severed appellee's cross-claim from the main action.[1] On appeal, appellant asserts the trial court erred in (1) asserting personal jurisdiction over it based upon the acts of other corporations; (2) admitting into evidence documents of these other corporations; and (3) overruling its special appearance. Appellant also contends the evidence is legally and factually insufficient to support the trial court's findings of fact. We affirm the trial court's order.

## STANDARD OF REVIEW

On appeal, we review de novo the trial court's determination to grant or deny a special appearance. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex.2002); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). Whether a court has personal jurisdiction over a defendant is a question of law. *Coleman*, 83 S.W.3d at 805–06; *BMC Software*, 83 S.W.3d at 794. However, to resolve the issue of jurisdiction, the trial court must frequently determine questions of fact. *Coleman*, 83 S.W.3d at 806; *BMC Software*, 83 S.W.3d at 794.

---

**1.** On February 12, 2004, plaintiffs intervened in the suit between appellant and appellee. On September 24, 2004, the trial court signed an Order Confirming Nonsuit, dismissing plaintiffs' claims against appellant.

We review fact findings for legal and factual sufficiency. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* at 795. We reverse the ruling for factual insufficiency of the evidence only if the ruling is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Minucci v. Sogevalor, S.A.*, 14 S.W.3d 790, 794 (Tex.App.-Houston [1st Dist.] 2000, no pet.). Unchallenged fact findings are binding on the appellate court. *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 632 (Tex. App.-Dallas 1993, writ denied). We review de novo the trial court's legal conclusions based on the findings of fact to determine their correctness. *BMC Software*, 83 S.W.3d at 794. If we determine a conclusion of law is erroneous but the trial court nevertheless rendered a proper judgment, the erroneous conclusion does not require reversal. *Id.*

### THE CORPORATE ENTITIES

According to appellee, Leviton Manufacturing Co., Inc., a company named Kintron Sdn Bhd manufactured the extension cord, which the plaintiffs purchased at a Wal-Mart store in 2000. Leviton alleges that, in 2001, Ho Wah Genting Berhad acquired a controlling interest in Kintron Sdn Bhd, at which time the company changed its name to Ho Wah Genting Kintron Sdn Bhd (hereinafter, "HWG Kintron"). After the acquisition, Kintron Sdn Bhd ceased to exist as a separate entity. Leviton argues that HWG Kintron, under the name of Kintron Sdn Bhd, formed contacts with the State of Texas by maintaining an office in Texas, by employing representatives in Texas, and by soliciting business in Texas. Leviton also argues that HWG Kintron, both before and after its name change, formed contacts with Texas by purposeful-ly taking steps to place a significant flow of its cubetap extension cords into the stream of commerce with the reasonable expectation that they would enter Texas.

On appeal, HWG Kintron contends its correct name is Ho Wah Genting Kintron Sdn Bhd and it does not agree it was doing business as or was formerly known by a different name.

### PLEADINGS

In its first issue, HWG Kintron asserts the trial court erred in asserting personal jurisdiction over it based upon the acts of other corporations because Leviton did not plead any facts or legal theories that would support a theory of successor liability, alter ego, single business enterprise, or any other basis for ignoring its separate corporate existence. Leviton counters that this case involves the liability of a successor to the "same entity," not an attempt to pierce the corporate veil.

In its second amended cross-claim, Leviton alleged "Ho Wah Genting Kintron Sdn Bhd d/b/a and f/k/a Kintron Sdn Bhd ('Kintron')" is "a nonresident, has done business in Texas and has continuing contacts with Texas. More specifically, Kintron has formed specifically affiliating contacts with the State of Texas." We conclude that Leviton's allegations put HWG Kintron on notice that Leviton sought to assert its claims against HWG Kintron in its corporate form as it currently exists, as it was "doing business," and as it was "formerly known." These allegations were sufficiently clear with regard to personal jurisdiction allegations. *See Whalen v. Laredo Nat'l Bancshares, Inc.*, 37 S.W.3d 89, 92–93 (Tex.App.-San Antonio 2000, pet. denied) (applying general rules of notice pleading to determine petition provided defendant with sufficient information to prepare a challenge to the asser-

tions of jurisdiction). Further, to the extent Leviton's pleadings were not sufficient to allege personal jurisdiction in Texas, HWG Kintron waived its complaint because it did not raise the issue in a motion to quash. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985).

## EVIDENCE ADMITTED
## BY TRIAL COURT

In its second issue, Kintron asserts the trial court erred in admitting into evidence certain of Leviton's exhibits, which Kintron contends were hearsay and irrelevant because the exhibits relate to other companies and consist of statements by other companies.

HWG Kintron first asserts the exhibits were inadmissible because they are irrelevant. As discussed above, HWG Kintron contends there are no pleading allegations that jurisdiction could be based on the conduct of other parties or because it is the successor-in-interest to Kintron Sdn Bhd. Therefore, HWG Kintron believes the exhibits were not relevant to any of the jurisdictional issues actually raised by the pleadings.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Generally, relevant evidence is admissible unless otherwise made inadmissible by the Constitution, statute, the Texas Rules of Evidence, or other rules prescribed pursuant to statutory authority. *See* TEX.R. EVID. 402. Because we have determined Leviton met its initial burden of pleading sufficient allegations to bring HWG Kintron within the provisions of the Texas long-arm statute, HWG Kintron's relevancy argument is without merit.

HWG Kintron next argues the exhibits are the documents of Kintron Sdn, Kintron Berhad, and Ho Wah Getting Berhad and are inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX.R. EVID. 801(d). "Out-of-court statements are not hearsay if offered for a purpose other than to prove the truth of the matter asserted." *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992). "An out of court statement, offered to show *what* was said, rather than the *truth* of what was said, is not hearsay." *Soliz v. State,* 794 S.W.2d 110, 112 (Tex.App.-Houston [1st Dist.] 1990, pet. ref'd) (emphasis in original).

The exhibits about which HWG Kintron complains are emails and letters that reference a date code process, products' tooling, price quotations, price negotiations, and purchase orders; invoices; letters and emails that reference product pricing, product testing, drawings, shipment of parts, and certificates of compliance and inspection data; an email regarding travel information; corporate records search results on companies other than the parties to this appeal; emails regarding an Austin, Texas company; emails and letters regarding past due payments, letters of credit, and product shipments; a letter that appears to contain information from the Kuala Lumpar Stock Exchange regarding Ho Wah Genting Berhad; and a company profile of Kintron Sdn Bhd. None of these exhibits were offered to prove the truth of any matter asserted within the documents. Therefore, HWG Kintron's inadmissible hearsay objection is without merit.

## SUCCESSOR LIABILITY

In its third issue, HWG Kintron challenges the legal and factual sufficiency of

the evidence in support of certain of the trial court's findings of fact. HWG Kintron first asserts the evidence is legally and factually insufficient to support the trial court's findings that "Ho Wah Genting Kintron Sdn Bhd is the successor in interest to Kintron Sdn Bhd, which no longer exists as a separate company." Leviton argues that Kintron Sdn Bhd and HWG Kintron are not separate entities; instead, HWG Kintron is Kintron Sdn Bhd's successor-in-interest "under either a stock merger transaction or a name change."

### Stock Merger Transaction

█ Leviton first asserts the evidence supports a finding that HWG Kintron is the successor-in-interest to Kintron Sdn Bhd under a stock merger transaction. Following a merger, "all liabilities and obligations of each domestic or foreign corporation and other entity that is a party to the merger shall be allocated to one or more of the surviving or new domestic or foreign corporations and other entities *as set forth in the plan of merger....*" TEX. BUS. CORP. ACT ANN. art. 5.06A(3) (Vernon 2003) (emphasis added); *see Shapolsky v. Brewton,* 56 S.W.3d 120, 137 (Tex.App.-Houston [14th Dist.] 2001, pet. denied)(applying Texas Business Corporations Act to Florida corporation's acquisition in bankruptcy of assets of New York corporation); *Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 139 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) ("The [Texas Business Corporations Act] protects both Texas corporations and foreign corporations like Lockheed, which is incorporated in Maryland."). Here, there appears to be

no dispute that: (1) Ho Wah Genting Berhad and Kintron Sdn Bhd existed as separate entities prior to 2001; (2) Ho Wah Genting Berhad acquired Kintron Sdn Bhd in 2001; and (3) following the acquisition, Kintron Sdn Bhd changed its name to Ho Wah Genting Kintron Sdn Bhd. However, the record contains no documents or testimony indicating the manner in which Ho Wah Genting Berhad acquired Kintron Sdn Bhd. Therefore, nothing in the record supports an implied finding that HWG Kintron is the successor-in-interest to Kintron Sdn Bhd under a stock merger transaction.

### Name Change

█ Leviton argues, in the alternative, that HWG Kintron is the successor-in-interest to Kintron Sdn Bhd under "a name change" and HWG Kintron is the "same entity" as Kintron Sdn Bhd. A corporate name change does not affect a company's identity, property rights, or liabilities. *See Zuniga v. Wooster Ladder Co.,* 119 S.W.3d 856, 862 (Tex.App.-San Antonio 2003, no pet.); *Northern Nat. Gas Co. v. Vanderburg,* 785 S.W.2d 415, 421 (Tex. App.-Amarillo 1990, no writ). The entities are the same for liability purposes. *See, e.g., Drennan v. Community Health Inv. Corp.,* 905 S.W.2d 811, 818 (Tex.App.-Amarillo 1995, writ denied).

In support of its name change theory, Leviton relies on the following evidence. HWG Kintron's Director of Marketing, Johnny Jan, held the same position at Kintron Sdn Bhd. In his deposition, Jan testified as follows: [2]

**2.** In its findings and conclusions, the trial court stated that Jan was "not a credible witness. As a result, this Court has discounted the self-serving, and facially inconsistent, testimony in Jan's deposition and affidavits." Prior to and during the special appearance hearing, Leviton objected to Jan's affidavits.

The objections were overruled and the affidavits were admitted into evidence. Leviton offered Jan's entire deposition into evidence. Because the trial court did not strike Jan's affidavits or deposition, and it did not identify the specific testimony it "discounted" as

Q. Before 2001, there was a company known as Kintron, correct?

A. Because the name of the company changed many times, but I don't have the information.

Q. In any event, people who buy products from your company have known your company as Kintron for some period of time, correct?

A. The abbreviation would be called Kintron, yes.

Q. Before 2001, the abbreviated name of your company was Kintron?

A. In my recollection it's—it was Kintron Sdn Bhd.

. . .

Q. Okay. Well, just to make clear, when you said that you've been with Kintron since 1989, what you meant to say is that you have been with Ho Wah Genting Kintron and Kintron Sdn Bhd and Kintron Berhad and other Kintron entities since 1989, correct?

A. Correct. Yeah, because this name is a new name and this new name was established in 2001. . . . .

. . .

Q. Here's all I'm trying to figure out. Did you have different entities sell to different regions or are we just talking about name changes in the corporation?

A. I think that it should only be name change.

[Counsel] I'm not sure he knows about what name change means and all that kind of stuff.

. . .

Q. Let me approach it this way, Mr. Jan. The Kintron entities that have sold extension cords in the last three years, are they one corporation that

has changed its name three times or are they three separate entities?

A. Because the company had changed name at one time, so legally I don't know whether it is the same company or different company.

Q. Okay. But it's basically the same group of people making the same product under different names, whatever the legal effect of that is?

A. The management had done some part changes.

Q. Okay. I feel the slope slipping. Let me—can we just agree that when we talk about Kintron that we are discussing whatever Kintron entity has been selling electrical cords in the last four years?

A. Yeah, regardless which Kintron.

Q. Okay. And the factories that formerly belonged to Kintron Sdn Bhd now belong to Ho Wah Genting Kintron, right?

A. It should belong to the present company.

Q. And with the exception of the natural give and flow of people who come and go, the people who formerly worked for Kintron Sdn Bhd now work for Ho Wah Genting Kintron, right?

A. That's the way it should be.

Q. And to the best of your knowledge, that's the way it is?

A. It should be the way it is.

. . .

Q. Well, you've already told me, sir, that Kintron is the abbreviation that your customers use when referring to your company, correct?

A. Uh-huh, correct.

"self-serving and facially inconsistent," we are not limited in our review of the record.

Q. And that's the name that's imprinted on Kintron's products; Kintron, correct?

A. No.

Q. The word "Kintron" isn't imprinted on Kintron's products?

A. Some has it, some don't have them.

Q. Some of Kintron's products have the word Kintron stamped on them, correct?

A. Some do.

. . .

Q. [Referring to the website www.kintron.com] Okay. And that really wasn't the point of my question, Mr. Jan. My question is—my question is this: Whether it is operated or maintained by Ho Wah Genting Kintron or not, there's no other Web site out there for Ho Wah Genting Kintron or any other Kintron entity in a language other than English, correct?

A. Correct. Just this one in English.

In his affidavit, Jan explained that the website was established by Kintron Sdn Bhd prior to 2001 and it still exists, however, it has not been updated in several years and it is not possible to order or purchase products from the site. The site contains a link to Jan's email address.

HWG Kintron presented no evidence to controvert Leviton's contention that HWG Kintron was the "same entity" as Kintron Sdn Bhd because the company had merely undergone a name change.

 The evidence is legally and factually sufficient to support an implied finding that HWG Kintron is the successor-in-interest to Kintron Sdn Bhd under a name change. Therefore, HWG Kintron did not satisfy its burden of negating this basis for personal jurisdiction. *See BMC Software*, 83 S.W.3d at 793. Under a "successor liability" theory, a nonresident defendant corporation not otherwise subject to the personal jurisdiction of a Texas court becomes so by virtue of succeeding to a corporation that is subject to personal jurisdiction in Texas. *Shapolsky*, 56 S.W.3d at 136. Because the evidence is sufficient to support the trial court's finding that HWG Kintron is the successor-in-interest to Kintron Sdn Bhd, Kintron Sdn Bhd's contacts may be imputed to HWG Kintron for the purpose of determining whether the evidence establishes that HWG Kintron had sufficient contacts with Texas to establish personal jurisdiction.

**PERSONAL JURISDICTION**

In its fourth issue, HWG Kintron asserts the trial court erred in denying its special appearance because the evidence properly before the court established that it did not have sufficient contacts with Texas to establish either specific or general jurisdiction.

 A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the United States Constitution and the Texas long-arm statute are satisfied. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996) (orig. proceeding). The Texas long-arm statute allows a Texas court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997); *BMC Software*, 83 S.W.3d at 795. The Texas long-arm statute reaches as far as the federal and state constitutional guarantees of due process allow. *CSR*, 925 S.W.2d at 594. Therefore, "the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations." *Id.*

 The due process clause permits a state to exert personal jurisdiction over a nonresident defendant only if the

defendant has some minimum, purposeful contacts with the state and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson–Austin v. Austin,* 968 S.W.2d 319, 326 (Tex.1998). A nonresident has sufficient contacts with the forum if it has purposely availed itself of the privileges and benefits of conducting business in Texas. *CSR,* 925 S.W.2d at 594. However, a nonresident should not be subjected to the jurisdiction of a Texas court based upon random, fortuitous, or attenuated contacts. *CSR,* 925 S.W.2d at 595. A nonresident defendant must have purposely established such minimum contacts with the forum that it could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985).

The minimum-contacts analysis is further divided into general and specific personal jurisdiction. General jurisdiction is present when a defendant's contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *CSR,* 925 S.W.2d at 595. General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *Id.*

The minimum-contacts analysis for specific personal jurisdiction focuses on the relationship between the defendant, the forum, and the litigation. *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex.1991). Specific personal jurisdiction is established if the defendant's alleged liability arises from, or is related to, an activity conducted within the forum. *Id.* The defendant's contacts must have been "purposely directed" at the forum and must have had a "substantial connection" that resulted in the alleged injuries. *Id.* at 228.

### Specific Jurisdiction

Leviton asserts the trial court has specific jurisdiction over HWG Kintron because HWG Kintron formed "specifically affiliating" contacts with Texas under the stream of commerce doctrine. Under the stream of commerce doctrine, a defendant has purposefully availed itself of the privilege of conducting activities in the forum state if the nonresident defendant sells its product to an independent distributor and there is a reasonable expectation that the product will enter the forum state. *See Kawasaki Steel,* 699 S.W.2d at 201. However, a nonresident defendant's mere awareness that its products might end up in the forum state is not enough to show that it purposely availed itself of the market of that forum state. *See CMMC v. Salinas,* 929 S.W.2d 435, 438 (Tex.1996) (citing *Asahi Metal Indus. Co. v. Superior Court of Calif.,* 480 U.S. 102, 110–11, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). There must be a substantial connection between the defendant and the forum state necessary for a finding of minimum contacts. *Id.* In *Asahi,* Justice O'Connor, writing for a four-member plurality, stated as follows:

> The "substantial connection" between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the prod-

uct for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 110–112, 107 S.Ct. at 1031–1032 (citations omitted).

▇▇▇ Thus, a manufacturer cannot fairly be expected to litigate in every part of the world where its products may end up; rather, its contacts with the forum must be more purposeful. *See CMMC*, 929 S.W.2d at 440.[3]

▇▇▇ Here, the evidence supports a finding that HWG Kintron purposefully directed its activities at Texas and had a "reasonable expectation" that its product would enter Texas. Leviton presented evidence that HWG Kintron was aware that its shipment orders called for delivery of its goods to Texas stores.[4] HWG Kintron shipped its cords directly to Texas retailers such as Michaels Stores, Inc. and Garden Ridge, L.P. HWG Kintron admits two Texas companies, Austin Innovations and Hikari Corporation, were customers of Kintron Sdn Bhd. Contrary to HWG Kintron's assertion that it is not aware of the distribution or retail facilities of its United States customers and does not discuss those matters with its customers, the evidence showed that HWG Kintron invoiced Michaels Stores, Inc. and Austin Innovations directly, and had letters of credit with Texas companies, such as HE Butt Grocery and Michaels Stores, Inc. Finally, HWG Kintron complies with the Underwriters Laboratory electrical standards for cords sold in the United States.

In 2000, when plaintiffs purchased the extension cord, HWG Kintron maintained its "US Liaison Office" in Dallas, Texas, and, out of this office, solicited business from and negotiated commercial transactions with American companies. HWG Kintron contends that George Pan, the "representative" who worked in Dallas, acted only as a broker and translator. However, in correspondence directed to Jan, Mr. Pan requested prices from Jan

---

**3.** *Compare CMMC v. Salinas*, 929 S.W.2d 435 (Tex.1996) (determining that a French corporation was not subject to the jurisdiction of Texas courts, even though the company knew the product was being shipped to Texas, because there had been no efforts to market the product in the forum and its reaching Texas was due to an isolated sale of the product); *CSR Ltd. v. Link*, 925 S.W.2d 591 (Tex.1996) (holding that an Australian company was not subject to the jurisdiction of Texas courts because it had no connections with Texas and there was no direct evidence that it knew its product would be distributed in Texas); *with Keen v. Ashot Ashkelon, Ltd.*, 748 S.W.2d 91 (Tex.1988) (concluding that an Israeli entity was subject to Texas jurisdiction because it delivered its product into the stream of commerce with a reasonable expectation that its product would enter Texas); *Kawasaki Steel*

*Corp. v. Middleton*, 699 S.W.2d 199 (Tex. 1985) (holding that a Japanese corporation, which confirmed orders for millions of dollars of steel shipped to Texas annually, could reasonably expect its product would end up in Texas, subjecting it to the jurisdiction of Texas courts).

**4.** HWG Kintron asserts this evidence is not determinative because title to its products passed to its customers in Malaysia, and there is no evidence it participated in or controlled the decision to ship its electrical cords to Texas. However, the controlling issue under the stream of commerce doctrine is the "reasonable expectation" that the product will be sold in Texas, not the "right of control." *Kawasaki Steel*, 699 S.W.2d at 201.

and informed Jan of negotiations he was conducting with another company on "Kintron's" behalf. Other correspondence from the "US Liaison Office" discussed purchase order shipment dates.

We hold that HWG Kintorn had minimum contacts with Texas sufficient to authorize an exercise of jurisdiction over it.

### Fair Play and Substantial Justice

Even when minimum contacts are established, a Texas court may not exercise jurisdiction over a nonresident defendant unless the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *CMMC*, 929 S.W.2d at 437. The Texas Supreme Court has stated that "[i]n this inquiry, it is incumbent upon the defendant to present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 231 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* Also, "distance alone is not ordinarily sufficient to defeat jurisdiction: 'modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'" *Id.* However, "[w]hen the defendant is a resident of another nation, the court must also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court." *Id.* at 228. The unique burdens placed upon a foreign defendant who must defend itself in a foreign legal system carries significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders. *Id.* at 229.

We hold that the Texas court's exercise of personal jurisdiction over HWG Kintron does not offend traditional notions of fair play and substantial justice. Merely because this is an "international dispute" does not mean that maintaining jurisdiction in Texas is unfair. *See LeBlanc v. Kyle*, 28 S.W.3d 99, 106 (Tex.App.-Texarkana 2000). "While international litigation does present a substantial burden on the defendant, the burden is not unreasonable considering the fact that a significant number of [HWG Kintron's] products are regularly shipped to and sold in this state." *S.P.A. Giacomini v. Lamping*, 42 S.W.3d 265, 276–77 (Tex.App.-Corpus Christi 2001, no pet.); *see also Asahi*, 480 U.S. at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part) ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity."); *LeBlanc*, 28 S.W.3d at 105–06 ("Considering that LeBlanc sent over 450 of its water heaters into Texas pursuant to its contract with Controlled Energy, LeBlanc could reasonably anticipate being brought into court here.").

It also appears that Texas has a strong interest in adjudicating this dispute. Leviton's claim for indemnification against HWG Kintron was triggered when the plaintiffs sued Leviton for injuries they

sustained due to an alleged defect in an extension cord manufactured by HWG Kintron. HWG Kintron ships thousands of these cords to Texas, the cords are sold in Texas stores, and are alleged to have caused serious injury in Texas. The underlying lawsuit by plaintiffs is on-going in a Texas court. Thus, the circumstances of this case lead us to conclude that Texas has an interest in deciding whether HWG Kintron must indemnify Leviton.

Accordingly, we conclude that the exercise of jurisdiction by the Texas court over HWG Kintorn does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

We affirm the trial court's order denying HWG Kintron's special appearance.